## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| ERNESTINE ELLIOTT, individually and as Personal Representative of the Estate of KATRINA M. COOK,<br><br>         Plaintiff,<br><br>    -against -<br><br>GARY, WILLIAMS, PARENTI, WATSON AND GARY, P.L.L.C., WILLIE E. GARY, CHANTHINA B. ABNEY, and LERONNIE MASON,<br><br>        Defendants. | Civil Action File No.<br><br><br><br>**COMPLAINT** |

COMES NOW Plaintiff ERNESTINE ELLIOTT, individually, and as Personal Representative of the Estate of her daughter KATRINA M. COOK, who alleges as follows for her complaint against Defendants GARY, WILLIAMS, PARENTI, WATSON AND GARY, P.L.L.C. (the "Gary Firm"), WILLIE E. GARY, CHANTHINA B. ABNEY, and   LERRONIE MASON:

### NATURE OF ACTION

1.     This is a civil action for legal malpractice, fraud, conversion, civil theft, and bad faith to recover compensatory and punitive damages arising from Defendants representation of Ms. Elliott in wrongful death claims related to a March 14, 2014 automobile accident in which Ms. Elliott's daughter, Katrina M. Cook, was killed.

2.     Defendants failed to bring two meritorious wrongful death claims on behalf of Ms. Cook's estate in a timely manner: (i) a products liability claim against the manufacturer of the car Ms. Cook was driving, a 2005 Nissan Infiniti; and (ii) a personal injury action against the owner and driver of a Freightliner tractor-trailer responsible for the accident, Schneider National Carrier, Inc. ("Schneider") and its employee-driver, Mr. Alhassane Dansoko. Defendants commenced a lawsuit against Nissan, but because they commenced the lawsuit after the 10-year statute of repose expired, it was dismissed. Defendants never commenced a lawsuit against Schneider and Dansoko and the statute of limitations is now expired.

3.     Defendant Willie Gary also fraudulently induced Ms. Elliott to turn over a $100,000 death benefit under the uninsured motorist coverage of her daughter's automobile policy, even though the insurer was willing to pay the death benefit directly to Ms. Elliott shortly after the March 14, 2014 accident without any intervention from Gary. In April 2016, Gary promised he would pay the entire $100,000 death benefit to Ms. Elliott if she signed the release required by the insurer. In reliance on his representations, Ms. Elliott did so, but Gary thereafter deducted a 40% contingency fee and alleged expenses from the policy proceeds, even though the uninsured motorist policy was outside the scope of his retention and no work on his part was required to obtain the death benefit. On the contrary, because of Gary's fraudulent interference,

2

Ms. Elliott had to wait more than two years to receive any portion of the death benefit and has still not received $52,357.21 plus interest.

## THE PARTIES

4.      Plaintiff Ernestine Elliott is a citizen of Georgia. She is the personal representative of the estate of her deceased daughter, Katrina M. Cook.

5.      Defendant Gary, Williams, Parenti, Watson and Gary, P.L.L.C. ("Gary Firm") is a Florida professional limited liability company whose members, Willie E. Gary, Lorenzo Williams, Robert V. Parenti, Donald N. Watson, Sekou Gary and Chanthina B. Abney, are Florida citizens.

6.      Defendant Willie E. Gary, the managing member of the Gary Law Firm, is a citizen of Florida.

7.      Defendant Chanthina R. Abney is a citizen of Florida and a member of the Gary Firm.

8.      Defendant LeRonnie Mason is a citizen of Florida and an attorney formerly employed by the Gary Firm.

## JURISDICTION AND VENUE

9.      This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this is a civil action where the matter in controversy exceeds $75,000 and is between citizens of different States.

10.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## BACKGROUND

**A.     The Fatal Automobile Accident.**

11.     On March 10, 2014, the 2005 Nissan Infiniti G35 that Ms. Cook was driving burst into flames when a Freightliner tractor-trailer traveling north on the C.H. James Parkway in Cobb County crashed into the rear of Ms. Cook's Infiniti. Ms. Cook, who was the only occupant in her Infiniti, was trapped and died in the fire. The driver of the Freightliner owned and operated by Schneider was uninjured.

12.     The fatal crash was precipitated when two cars traveling south on the Parkway, a 1998 Mazda and a 2001 Toyota Tundra, collided, sending the Toyota across the center lane to hit Ms. Cook's north-traveling Infiniti. Because the Freightliner tractor-trailer was tailgating directly behind Ms. Cook's Infiniti and exceeding the speed limit, it could not stop before rear-ending the Infiniti. Design defects in the Infiniti caused it to burst into flames upon impact. None of the drivers or occupants of the three other cars involved in the accident died and, other than Ms. Cook, only the driver of the Mazda sustained any personal injuries.

**C.      Willie Gary Solicits Plaintiff to Retain Him and His Firm.**

13.     On March 11, 2014, the day after Ms. Cook's death, Willie Gary, a lawyer based in Stuart, Florida, contacted Ms. Cook's mother, Plaintiff Ernestine Elliott, to solicit her to retain him and the Gary Firm to bring wrongful death claims on behalf of Ms. Cook's estate. On Saturday, March 15, 2014, Gary travelled to Georgia to meet personally with Ms. Elliott and Ms. Cook's father, Robert Elliott.

14.     Although Ms. Cook's parents wanted to wait until after their daughter's funeral to discuss legal action, Gary insisted that they retained him immediately to "preserve critical evidence." Gary asserted that doing so was critical in order to bring two clams against the parties responsible for Ms. Cook's death: a "crashworthiness" product liability clam against the manufacturer, Nissan, because the care should not have burst into flames when it was rear-ended by the tractor-trailer; and (ii) a negligence claim against the owner-operator of tractor-trailer, Schneider National Carrier, Inc. ("Schneider"), and its employee-driver, Mr. Alhassane Dansoko, because the truck shouldn't have been speeding or tailgating. Gary represented that he had obtained billion-dollar verdicts in similar cases and that he could obtain such a recovery for Ms. Cook's estate if she retained him immediately.

15.     Ms. Elliott believed Gary's representations and executed the retainer agreement annexed hereto as Exhibit 1 on or about March 15, 2014.

16.    Despite Gary's insistence that immediate action was required to protect Ms. Elliott's rights, he and the other defendants did nothing to do so. On the contrary, Defendants took no action to preserve the wrecked Infiniti and other vehicles involved in the crash. As a result, critical evidence was lost.

**D.    Defendants Fail to Commence an Action Against Nissan Prior to the Expiration of the Statute of Repose.**

17.    On May 24, 2016, over two years after Ms. Cook's fatal crash, the Gary Firm commenced a wrongful death action in the Superior Court of Cobb County against Nissan North America, Inc., *Ernestine Elliott, as Personal Representative of the Estate of Katrina Cook v. Nissan North America, Inc.*, Case No. 16-1-4096-99 (the "Nissan Action"). The Nissan Action asserted claims for strict liability, negligent design and failure to warn, and breach of implied warranties.

18.    Nissan removed the action to the United States District Court for the Northern District of Georgia, where it was assigned Civil Action Number 1:16-cv-02400-LMM. Defendants Gary, Mason and Abney appeared on behalf of Ms. Elliott.

19.    On April 20, 2017, Nissan moved for summary judgment on the grounds that (i) the claims seeking wrongful death damages were time barred under the two-year statute of limitations set forth in O.C.G.A. § 9-3-33; and (ii) the product liability claims were barred under Georgia's ten-year statute of repose set forth in

O.C.G.A. § 51-1-11(c), which requires that such claims be brought no later than ten years after the first sale of the product alleged to have caused plaintiff's injuries.

20.     In this case, the first sale of Ms. Cook's 2005 Infiniti G35 was on September 3, 2005, which required that any product liability claims be commenced on or before September 3, 2015. Here, Gary insisted that Ms. Elliott retain him only a few days after Ms. Cook's death on March 10, 2014, which provided Defendants with almost 18 months to file product liability claims against the manufacturer. Defendants failed to do so, however, waiting until May 24, 2016 – more than eight months after the statute of repose expired.

21.     Defendants did not oppose the summary judgment motion. On May 16, 2017, the court granted the motion and entered judgment in favor of Nissan. On May 18, 2017, Defendants filed a motion for reconsideration. On May 27, 2017, the court granted the motion for reconsideration, but upon reconsideration, reaffirmed its decision granting summary judgment in favor of Nissan, holding that "Plaintiff's claims remain dismissed."

**E.     Defendants Fail to Commence an Action Against Schneider.**

22.     Defendants took no action to commence an action against Schneider, the owner-operator of the Freightliner tractor-trailer that rear-ended Ms. Cook's Infiniti, or its employee driver, Mr. Alhassane Dansoko. The two-year statute of

limitations for wrongful death claims expired on March 10, 2016, two years after Ms. Cook's death on March 10, 2014. Because the two-year statute of limitations for tort claims commenced on the date of Ms. Elliott's appointment as Ms. Cook's Personal Representative, September 26, 2014, the statute of limitations for torts expired on September 26, 2016.

### F. Gary Fraudulently Retains the Death Benefit under Ms. Cook's Uninsured Motorist Policy.

23.     Ms. Cook had an automobile insurance policy issued by GEICO General Insurance Company that included a $100,000 death benefit under the policy's uninsured motorist coverage. Shortly after the accident, a GEICO representative informed Ms. Elliott that Ms. Cook had named her as the policy beneficiary and that she was entitled to the death benefit because the driver of the Mazda that had commenced the multi-car accident was uninsured.

24.     When Ms. Elliott mentioned that to Gary, he insisted that she direct GEICO to send him the $100,000 check. He said that as her lawyer, he would, as "courtesy" to her, review all payments and issues relating to the accident, including the GEICO $100,000 death benefit. In reliance on Gary's representations, Ms. Elliott authorized GEICO to send the check to Gary and to communicate with him regarding the uninsured motorist coverage under her daughter's policy.

25.     Gary thereafter stopped returning Ms. Elliott's calls and generally became unavailable. On the few occasions Ms. Elliott managed to speak with Gary, he asserted that he was "getting close" and "waiting to hear from the courts." He continued to promise that Ms. Elliott would obtain a "billion-dollar recovery" and that he would make arrangements for her to receive the $100,000 death benefit soon, but that amount would be dwarfed by the "billion-dollar recovery" he would obtain from Nissan and Schneider.

26.     Rather than work on the "billion-dollar" claims against Nissan and Schneider, however, Defendants asserted a claim for the $25,000 policy limits under the insurance policy of the Mazda's owner. While the Mazda driver was uninsured because her license had expired, the owner, who was the driver's mother, had an insurance policy. Like Ms. Cook's policy, that policy was also issued by GEICO.

27.     GEICO agreed to tender the $25,000 policy limits under the Mazda owner's policy. In October 2014, without any prior explanation to Ms. Elliott, Gary sent her a "Closing Statement" that incorrectly showed the total amount of the settlement under the Mazda owner's GEICO policy as $125,000. A copy of that Closing Statement is annexed hereto as Exhibit 2.

28.     After receiving the Closing Statement, Ms. Elliot called Gary to find out what it meant. In a telephone conversation on or about October 15, 2014, Gary

falsely told Ms. Elliott that he had negotiated a $125,000 settlement under the Mazda owner's GEICO policy. He also falsely stated that his work to obtain the settlement required him to incur over $8,000 in expenses and that after deducting his 40% contingency fee and a $5,000 future expense reserve, Ms. Elliott would receive $62,642.79.

29.     Ms. Elliott asked if that was all she would receive for her claims arising from her daughter's death. Gary assured her that it was not. He said that the settlement under the Mazda owner's policy was "peanuts" compared to the "billion-dollar" recovery he expected to obtain from Nissan and Schneider. In response to Ms. Elliott's question as to the status of those claims, Gary falsely stated that the lawsuits had been commenced and that he and his team were aggressively prosecuting them.

30.     In reliance on Gary's representations, Ms. Elliott signed the Closing Statement. Ms. Elliott therefore expected to receive the $62,642.79, which Gary had represented was her share of the $125,000 settlement under the Mazda owner's insurance policy. Weeks and months went by, however, without receiving either the funds or any communication from Gary or anyone else at his firm.

31.     Ms. Elliott again started calling Gary regularly, but was told he wasn't available. Finally, in May 2016, Ms. Elliott concluded that Gary was not adequately

representing her interests. On May 26, 2015, she sent Gary a termination letter requesting the return of her complete file. A copy of that letter is annexed hereto as Exhibit 3. Gary ignored that letter, however, and continued avoid Ms. Elliott's calls.

32.    In December 2015, Gary's assistant sent Ms. Elliot a GEICO release form for the $100,000 death benefit under the uninsured motorist coverage in Ms. Cook's automobile policy. Ms. Elliott was confused and upset over the release because she didn't understand what it was or why Gary had not responded to her termination letter and her many unanswered telephone messages.

33.    Shortly before Christmas 2015, Gary finally called Ms. Elliott. He claimed not to have received her May 26, 2015 termination letter and assured her that everything was "on track" for a billion-dollar recovery. He told Ms. Elliott that he was "her lawyer for life" and that "quick settlements" are never a good idea because defendants and their insurers refuse to make reasonable settlement offers until shortly before trial. He falsely asserted that GEICO had delayed issuing the $100,000 death benefit but, due to his efforts, it had finally agreed to issue a check. GEICO would not do so, however, unless Ms. Elliott executed the release.

34.    In reliance on Gary's representations, Ms. Elliott agreed to reconsider firing him. She was still skeptical of signing the GEICO release, however, and she did not do so immediately.

11

35.    In April 2016, Gary called again asking for the release. He repeated his prior false representations regarding the status of the claims against Nissan and Schneider and he promised that he would pay Ms. Elliott the entire $100,000 death benefit as soon as GEICO sent it to him. In reliance on Gary's representations, Ms. Elliott may have signed and returned the GEICO release, but she believes Gary may have forged her signature. The unexecuted release is annexed hereto as Exhibit 4.

36.    In June 2016, Ms. Elliot received the $62,642.79 payment that Gary had promised was her share of the $125,000 settlement under the Mazda owner's automobile policy. She did not understand why it had taken so long to receive that payment, since the settlement had allegedly been negotiated, and she had signed the Closing Statement, almost two years previously in October 2014. She was glad to receive the money, however, and although she repeatedly tried to call Gary to inquire about the payment and the status of the $100,000 death benefit, he again was unavailable and did not return her phone calls.

### G.    Defendants Conceal Their Misconduct.

37.    The final order in the Nissan Action, which reaffirms the court's summary judgment in favor of Nissan, was filed on May 30, 2017. Defendants did not inform Ms. Elliott that the Nissan Action had been dismissed, however, until over a year and a half later, in January 2019. On the contrary, Defendants failed to

advise Ms. Elliott of any developments in the Nissan Action and Willie Gary falsely told her that Defendants had commenced an action against Schneider when, in fact, no such action had been commenced.

38.     By mid-2017, one year after receiving the $62,642.79 payment Gary had represented was her share of the settlement under the Mazda owner's policy, Ms. Elliott again embarked on a concerted effort to speak to Gary and his colleague, defendant LeRonnie Mason, about the status of her litigation and the $100,000 death benefit. They ignored her inquires, however, and their assistants made excuses that they were very busy with "emergencies" and other priority matters. Ms. Elliott left messages for them to send her the case so she could verify for herself the status of the cases, but they did not respond to her messages or send the files.

39.     Finally, on January 17, 2019, LeRonnie Mason telephoned Ms. Elliott and advised her that the Nissan Action had been dismissed due to the expiration of the statute of repose. She subsequently received a letter dated January 17, 2019 from Mr. Mason, which is annexed hereto as Exhibit 5, stating:

> [T]he Court granted the motion for Summary Judgement filed by Nissan North America based on the Statute of Repose. As such we were unable to appeal this issue as the Statute of Repose is not appealable and therefore had no alternative but to close our file.

> This letter will also confirm our conversation this morning where I told you we were in the process of retrieving your file from our storage facility. As I explained this could take a couple of weeks as we have thousands of files in storage. In the interim, I will be forwarding to you a complete copy of your file on a computer disc within the next few days.

40.     While Mr. Mason asserted that he sent a prior letter on November 17, 2017, Ms. Elliott never received such a letter. Nor has she received her case files despite Mr. Mason's promise to send them to her.

**H.     The Gary Firm's Pattern and Practice of Missing Deadlines and Defrauding Clients.**

41.     Ms. Elliott's meritorious claims against the parties responsible for her daughter's tragic death are not the first claims that the Gary Firm and its lawyers have lost due to missed deadlines. On the contrary, the Gary Firm and its lawyers maintain no coherent system to keep track of the expiration of statutes of limitations and other deadlines imposed by court rules or orders. A series of lost cases, each one of critical importance to the Gary Firm's client, due to the Gary Firm's inability to keep track of or comply with deadlines, establishes that the circumstances of the loss of Ms. Elliott's claims establish an entire want of care and an indifference to consequences sufficient to warrant an award of punitive damages.

42.     The irony of the Gary Firm's gross incompetence is that it is one of the most financially successful plaintiffs' firms in the country. The firm's founding and

managing partner, Willie Gary, describes himself as the "Giant Killer" because of his track record of winning multimillion-dollar verdicts against some of the largest and most powerful companies in the world.

43.     Yet the Gary Firm has repeatedly been accused by former clients of malpractice, fraud, and other misconduct. In 2003, for example, a group of former clients sued the Gary Firm for fraud and breach of fiduciary duty, alleging that Gary had defrauded them out of $51.5 million in a settlement of an employee gender discrimination lawsuit. The former clients alleged that although Gary concealed the actual settlement amount from them, Gary's local Michigan counsel inadvertently disclosed a spreadsheet setting forth the actual settlement amount to one of the clients. The clients then sued Gary for fraudulently stealing $51.5 million of the settlement. *See Kubik, v. Gary,* 03-cv-73350 (E.D. Mich.) (the "*Kubik* Action").

44.     Gary defended against the Michigan allegations by asserting that they were implausible, *i.e.*, that a successful law firm such as the Gary Firm would never defraud its clients. After examining some of Gary's emails *in camera*, however, the Michigan court granted the plaintiffs' motion to compel, finding:

> *There is probable cause to believe that a fraud has been attempted or committed* and that the [allegedly privileged] communications at issue were made in furtherance of it.

Exhibit 6 (Feb. 17, 2005 Order in the *Kubik* Action) at 9 (emphasis added).

45.     The Michigan court also determined that the Gary Firm may regularly engage in fraud against its clients and that otherwise privileged emails had to be produced under the crime/fraud exception to the attorney-client privilege:

> [The Gary Firm] may have used a common fraudulent settlement agreement scheme in a variety of cases, and that discussions [among the Gary Lawyers] about the prospective structure of this scheme may have involved advice in furtherance of fraud.

Id. at 8 (emphasis added).

46.     In fact, an expert report by Yale Law Professor Lawrence Fox prepared for the Kubik plaintiffs recently became publicly available. A copy of that report is annexed hereto as Exhibit 7. Professor Fox, one of the country's leading experts in legal ethics, explains:

> This is the saddest example of lawyer misconduct I have directly encountered in years of practice. The defendants here, masquerading as champions of their clients and others they categorize as down-trodden or oppressed, in fact used their representation of their clients and these others they purported to represent, to advance their own financial interests, literally taking money out of the hands of their clients and systematically violating multiple duties these lawyers owed them. Their conduct not only injured their clients but also brought opprobrium on the entire profession.

Fox Report (Exhibit 7) at 1-2, 3.

47.     The Gary Firm has also repeatedly lost meritorious cases due to gross negligence in missing deadlines and failing to comply with basic court rules and

procedures – conduct that is difficult to explain considering the firm's track record of success and the qualifications and experience of the firm's lawyers. In a potentially landmark race discrimination case brought against the entertainment industry, for example, the Gary Firm failed to obtain racially derogatory emails sent by the defendants' employees. After the Gary Firm retained a specialized e-discovery firm to review emails produced by defendants William Morris and Creative Artists Agency, the e-discovery firm produced a memorandum identifying hundreds of emails containing racially derogatory terms. The Gary Firm never bothered to obtain the racially derogatory emails, however, and instead allowed the e-discovery firm to return them to the defendants. A federal district court judge reviewing the facts of that case concluded,

> It is inexplicable why the Gary Firm failed to obtain the actual underlying emails [identified on the e-discovery memorandum].

*Rowe v. Gary*, 181 F. Supp. 3d 1161, 1192 (N.D. Ga. 2016) (the "*Rowe* Action").

48.    Between 2014 and 2016, the two years in which Defendants were allowing Ms. Elliott's claims to languish and become time-barred, the Gary Firm and its lawyers lost several other cases due to missed deadlines and failure to comply with court orders. In 2014, for example, Ms. Zella Darleen Teague retained Gary to bring a wrongful death case against the tobacco industry when her husband, a life-

long smoker, died of lung cancer. Gary waited until June 24, 2016 – three days after the statute of limitations expired – before filing the complaint. Although the case proceeded because Gary had filed a "civil cover sheet" shortly before the statute expired, it was ultimately dismissed because Gary and his firm repeatedly missed court deadlines, failed to disclose mandatory experts, and failed to offer any coherent explanation for their misconduct. The court explained why it could not grant the Gary Firm's motion to excuse its repeated defaults:

> There is a procedure in place. *There are rules of the court [that] must be complied with . . . or else cases will just run amuck, and the justice system really will fall, and no one will benefit from that.*

> So when the Court takes the totality of the circumstances under consideration . . . *the [applicable] factors do weigh against finding excusable neglect in this instance;* and with no excusable neglect, the plaintiff's motion to modify and extend the deadlines is denied.

(emphasis added).

49.     During Gary's disastrous prosecution of the *Teague* case, Gary and the same lawyers working on Teague also represented Ms. Geneva Cook-Gervais in a similar wrongful death case against the tobacco industry. The pre-trial deadlines in the *Cook-Gervais* case were approximately two months after the deadlines in *Teague*. Thus, even though the Gary lawyers knew they had failed to comply with the *Teague* deadlines, including the *Teague* court's admonition quoted above, they

18

did nothing to attempt to comply with the *Cook-Gervais* deadline. When the tobacco defendants moved for summary judgment based on the failure to disclose mandatory experts, the Gary lawyers told Ms. Cook-Gervais that she had no choice but to accept a "nuisance value" settlement of $50,000 to avoid outright dismissal of her case. Like Ms. Elliott and Ms. Teague, Ms. Cook-Gervais had been solicited by Gary's promises that her claim would result in a "billion-dollar recovery."

50.    In 2015, before losing the *Teague* and *Cook-Gervais* cases, the Gary Firm lost other meritorious cases due to its repeated failure to comply with court orders and deadlines. On August 25, 2015, for example, a Florida state court dismissed three cases based on a finding that the Gary Firm had failed to comply with multiple court-imposed deadlines and engaged in a "contumacious disregard of the Court's authority." At a hearing on that date, Judge Roby of Florida's 19th Judicial Circuit found that the firm had repeatedly failed to comply with his orders, holding:

> The Court further *finds that this is a contumacious disregard of the Court's authority*, that had there been an issue relating to need, being an extension of the order*, the plaintiff could have very well filed a motion to that effect and waiting until today and coming up with what the Court finds to be specious arguments are inappropriate, and this matter is dismissed*.

(emphasis added).

51.     The August 25, 2015 date of that hearing was still well within the two-year statute of limitations governing Ms. Elliott's claims. Had the Gary Firm and its lawyers decided to implement a general review of applicable deadlines in its cases at that time, there was still more than six months to file timely actions on behalf of Ms. Elliott and Ms. Cook's estate. The Gary Firm's failure to do so reflects a level of gross negligence and reckless indifference to consequences that mandates the imposition of punitive damages.

## FIRST CLAIM FOR RELIEF
### (Legal Malpractice, Breach of Contract, Breach of Fiduciary Duty)

52.     Ms. Elliott, individually and on behalf of Ms. Cook's estate, repeats the allegations set forth in paragraphs 1 through 51, as though fully set forth herein.

53.     On or about March 15, 2014, Ms. Elliott entered into the Retainer Agreement with the Gary Firm annexed hereto as Exhibit 1.

54.     Under the Retainer Agreement, Ms. Elliott entrusted Gary, the Gary Firm and its other lawyers with representing her interests in prosecuting claims arising from Ms. Cook's death, including claims against Nissan and Schneider.

55.     Under the Retainer Agreement, the Gary Firm, Willie E. Gary, Chanthina Abney and LeRonnie Mason (collectively, with the Gary Firm, the "Gary Lawyers") agreed to represent Ms. Elliott in prosecuting such claims.

56.     The Retainer Agreement gave rise to an attorney-client relationship between Ms. Elliott, as client, and the Gary Lawyers, as attorneys, which existed from March 11, 2014 through January 17, 2019.

57.     Defendants owed a duty under the Retainer Agreement to represent Ms. Elliott with ordinary care, skill, and diligence in accordance with the accepted standards of professional service and competence expected of lawyers representing clients in Georgia wrongful death cases.

58.     Defendants breached their duty under the Retainer Agreement by failing to exercise the ordinary care, skill, and diligence in accordance with the accepted standards of professional service and competence expected of lawyers representing clients in Georgia wrongful death cases.

59.     Defendants owed a fiduciary duty under the Retainer Agreement to place Ms. Elliott's interests over Defendants' own interests.

60.     Defendants breached their fiduciary duties under the Retainer Agreement by placing their own interests over Ms. Elliott's interests.

61.     Defendants breached their fiduciary duties, contractual duties, and duties of ordinary care, skill, and diligence under the Retainer Agreement by, *inter alia*, engaging in the following conduct:

(i)     failing to commence the Nissan Action in a timely fashion, before expiration of the statute of repose on September 3, 2015 and the expiration of the statute of limitations for wrongful death claims on March 10, 2016;

(ii)    failing to commence any action against Schneider before expiration of the statutes of limitations for wrongful death and tort claims on March 10, 2016 and September 17, 2016, respectively;

(iii)   failing to keep Ms. Elliott advised of the developments in the Nissan Action and Defendants' failure to commence an action against Schneider National;

(iv)    misrepresenting that actions against Nissan and Schneider had been commenced when they had not been;

(v)     fraudulently representing to Ms. Elliott that they would protect her interests in the $100,000 death benefit under the uninsured motorist coverage of her daughter's automobile policy;

(vi)    falsely promising to pay the entire $100,000 death benefit to Ms. Elliott once GEICO paid the death benefit to them;

(vii)   deducting a contingency fee from the $100,000 death benefit even though it did not fall within the scope of their retainer agreement and no work was required to obtain the death benefit;

(viii)  deducting alleged expenses from the $100,000 death benefit even though no expenses were required to obtain the death benefit; and

(ix)    fraudulently retaining $52,357.21 of the death benefit and Ms. Elliott's share of the $25,000 settlement under the Mazda owner's GEICO policy.

62.     These breaches of Defendants' fiduciary, contractual and professional

duties caused injury to Ms. Elliott, including, but not limited to:

(i)     dismissal of the Nissan Action, which according to Willie
Gary would have resulted in a "billion-dollar recovery;"

(ii)    the loss of the right to start an action against Schneider,
which Gary said would have resulted in a "billion-dollar
recovery;"

(iii)   the delay in receiving any portion of Ms. Elliott's
$100,000 death benefit under Ms. Cook's GEICO policy
and the loss of $52,357.21 of that death benefit to date; and

(iv)    the loss of her share of the $25,000 settlement under the
Mazda owner's GEICO policy.

63.     An affidavit of merit pursuant to O.C.G.A. § 9-11-9.1 is annexed

hereto as Exhibit 8.

## SECOND CLAIM FOR RELIEF
### (Fraud – Against the Gary Firm and Willie Gary)

64.     Ms. Elliott repeats the allegations set forth in paragraphs 1 through 63,

as though fully set forth herein.

65.     In telephone calls beginning shortly after Ms. Cook's death on March

10, 2014 and extending through October 2014, Willie Gary represented to Ms. Elliott

that she should authorize GEICO to send the death benefit under the uninsured

motorist coverage of Ms. Cook's automobile insurance policy to him because he

23

would protect Ms. Elliott's rights under the policy as a "courtesy." Gary's fraudulent representations are set forth in detail, *supra*, at ¶¶ 24-25, 28-30.

66.     When GEICO refused to issue a check for the $100,000 death benefit without a signed release from Ms. Elliott, Gary fraudulently induced Ms. Elliott to sign the release by promising to send her the entire $100,000 once he received it. Gary's fraudulent representations are set forth in detail, *supra*, at ¶¶ 33-35.

67.     In reliance on Gary's fraudulent representations and promises, Ms. Elliott signed the GEICO release annexed hereto as Exhibit 4.

68.     By relying on Gary's false representations, Ms. Elliott incurred damages, including:

> (i)     The delay in receiving any portion of her $100,000 death benefit under Ms. Cook's GEICO policy and the loss of $52,357.21 of that death benefit to date; and
>
> (ii)    The loss of her share of the $25,000 settlement under the Mazda owner's GEICO policy.

### THIRD CLAIM FOR RELIEF
### (Conversion – Against the Gary Firm and Willie Gary)

69.     Ms. Elliott repeats the allegations set forth in paragraphs 1 through 68, as though fully set forth herein.

70.     The Gary Firm and Willie Gary assumed and exercised the right of ownership over the $100,000 check representing the $100,000 death benefit under

Ms. Cook's insurance policy without authorization and in hostility to Ms. Elliott's rights.

71.     That conduct by the Gary Firm and Willie Gary constitutes (i) an act of dominion over Ms. Elliott's personal property inconsistent with her rights; and (ii) an unauthorized appropriation.

72.     That conduct by the Gary Firm and Willie Gary caused Ms. Elliott to incur damages, including:

> (i)     The delay in receiving any portion of her $100,000 death benefit under Ms. Cook's GEICO policy and the loss of $52,357.21 of that death benefit to date; and

> (ii)    The loss of her share of the $25,000 settlement under the Mazda owner's GEICO policy.

## FOURTH CLAIM FOR RELIEF
### (Bad Faith Liability under O.C.G.A. § 13-6-11 – Against the Gary Firm and Willie Gary)

73.     Ms. Elliott repeats the allegations set forth in paragraphs 1 through 72, as though fully set forth herein.

74.     The Gary Firm and Willie Gary have acted in bad faith in their assumption and exercise of ownership rights over Ms. Elliott's $100,000 death benefit under Ms. Cook's insurance policy.

75.     Their fraudulent misrepresentations that they would protect Ms. Elliott's rights under the policy and pay her the entire $100,000 death benefit and their subsequent retention of $52,537.21 of the death benefit constitutes stubbornly litigious behavior.

76.     In addition, their false representations that they had commenced timely lawsuits against Nissan and Schneider were made intentionally to prevent Ms. Elliott from firing them and taking other actions to protect her rights.

77.     Their conduct caused Ms. Elliott unnecessary trouble and expense, including forcing her to bring this action to recover her property and damages for their inexplicable failure to commence timely claims against Nissan and Schneider.

78.     Ms. Elliott is therefore entitled to recover the expenses of this action, including reasonable legal fees, under O.C.G.A. § 13-6-11.

## FIFTH CLAIM FOR RELIEF
### (Punitive Damages – Against the Gary Firm and Willie Gary)

79.     Ms. Elliott repeats the allegations set forth in paragraphs 1 through 78, as though fully set forth herein.

80.     The conduct of the Gary Firm and Willie Gary described above, including their failure to commence timely actions against the parties responsible for Ms. Cook's death, their failure to implement an effective system to keep track of

critical deadlines, their repeated loss of meritorious cases due to missed deadlines and failure to comply with court rules and orders and their unauthorized assumption and exercise of Ms. Elliott's rights of ownership to the $100,000 death benefit under Ms. Cook's insurance policy constitutes clear and convincing evidence that their actions showed willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequence.

81.     The Gary Firm and Willie Gary acted, or failed to act, with the specific intent to cause harm to their clients, including Ms. Elliott.

82.     The Gary Firm and Willie Gary are therefore liable for punitive damages under O.C.G.A. § 51-11-2 in an amount to be proven at trial.

## JURY DEMAND

83.     Ms. Elliott demands a jury on all issues that may be tried by jury.

## PRAYER FOR RELIEF

WHEREFORE Ms. Elliott demands judgment as follows:

    (i)     under the First Claim for Relief, an award of compensatory damages against all Defendants to be proven at trial, but at least $100 million;

    (ii)    under the Second through Sixth Claims for Relief, an award against the Gary Firm and Willie Gary including:

(a)     compensatory damages in an amount to be proven at trial;

(b)     punitive damages in an amount to be proven at trial;

(iii)   under all Claims for Relief, an award against all Defendants including:

(a)     the expenses of this litigation including reasonable legal fees; and

(b)     such other legal or equitable relief as the Court deems appropriate and just.

Dated:   December 30, 2020

*/s/ Todd K. Maziar*

_____

Todd K. Maziar
Ga. Bar No. 479860
P.O. Box 56205
Atlanta, Ga 30343
(404) 355-3444

Of counsel:

Edward Griffith
(to be admitted pro hac vice)
The Griffith Firm
45 Broadway, Suite 2200
New York, New York 10006
(646) 645-3784 (mobile)

*Counsel for Plaintiff Ernestine Elliott, individually and as Personal Representative of the Estate of Katrina M. Cook*

28